636 So.2d 254 (1994)
STATE of Louisiana, Appellee,
v.
Scott BOURQUE, Defendant-Appellant.
No. CR 93-594.
Court of Appeal of Louisiana, Third Circuit.
February 16, 1994.
Rehearing Denied June 8, 1994.
*257 Edward B. Broussard, Abbeville, for the State.
Thomas E. Guilbeau, Lafayette, for Scott Bourque.
Before COOKS, SAUNDERS and WOODARD, JJ.
SAUNDERS, Judge.
Defendant, Scott Bourque, was indicted for the second degree murder of Jasper Fontenot which occurred on the night of Easter Sunday, April 15, 1990, at the "Barn Lounge" in Gueydan, Louisiana. Defendant's first jury trial in Vermilion Parish ended in a mistrial during jury selection because most of the veniremen knew either the defendant, the victim, or their families, and a fair and impartial jury could not be selected. Venue for the defendant's second trial was changed to Lafayette Parish, and trial began on February 1, 1993. On February 4, 1993, the jury found the defendant guilty of second degree murder and he was later sentenced to the statutorily mandated sentence of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. LSA-R.S. 14:30.1. It is from this conviction and sentence that defendant appeals. We affirm.

FACTS
The shooting death of Jasper Fontenot occurred on the night of Easter Sunday, April 15, 1990. Terry Lougon, a first cousin of Jasper Fontenot, a friend of defendant and the owner of the "Barn Lounge," testified that the victim had backed his car into the defendant's car while the two were at a party at the Lougon home approximately one year before the shooting. Jasper Fontenot had agreed to pay the defendant $80.00 for damages to the defendant's car but as of April 15, 1990, he had not given the defendant the money he owed. Dwight Smith, a witness for the defense, testified that two or three weeks before the shooting, he was riding around town with Jasper Fontenot when the defendant stopped Fontenot's car and they talked about the money.
On the night of April 15, 1990, the defendant arrived at "The Barn" and asked Terry Lougon if that was Jasper Fontenot at the end of the bar. The defendant went over and spoke with Fontenot, but no one who witnessed this conversation testified that their conversation was loud or angry. Tamatha Broussard testified that after the defendant finished talking with Fontenot, the defendant asked Terry Lougon if he could use the office phone. Lougon told the defendant that he did not have one and gave defendant his house key so defendant could use his house phone. At this point, the defendant said, "I ought to take care of him," and Lougon told defendant, "Man, I don't want any trouble." The defendant turned and began to walk out of the lounge, and then turned around again and came back, pulled out a 9 mm semi-automatic pistol from his pants and said, "I'm going to take care of that mother f____r right now."
Tamatha Broussard told Lougon, "I'm out of here" and began to run to the side door. She saw Lougon grab defendant's hand and Lougon told her, "No, it's o.k., I've got it." Lougon and the defendant struggled and the defendant eventually pushed Lougon onto the pool table. Tamatha Broussard saw Fontenot turn around to look at the defendant and Lougon struggling. Tamatha Broussard testified that "I guess he thought that Terry needed help, that Scott and Terry were fighting." Tamatha Broussard saw Fontenot turn and take a step toward Lougon and the defendant, but she did not see the defendant actually shoot Fontenot because she was running out of the side door. Tamatha Broussard testified that Fontenot never took a karate stance or made any aggressive moves towards the defendant, nor did Fontenot do anything to irritate or aggravate the defendant.
Lougon's version of the events coincided with that of Tamatha Broussard. Lougon *258 testified that after the defendant and Fontenot spoke, the defendant came back to him (Lougon) and began to ask more questions about Fontenot. Lougon told the defendant that he did not want any trouble in the club and the defendant began to leave to use the telephone at Lougon's home. Lougon saw the defendant sitting at the bar and Fontenot standing at the end. The next thing he saw was the defendant saying, "I'm going to take care of this shit right now," as he came around the corner of the bar pulling out his 9 mm nickel-plated handgun from his pants. Lougon walked up to the defendant and they began to struggle over the gun. After one shot was fired, Lougon let go and the defendant pushed him onto the pool table. The defendant then fired three more shots.
Elizabeth Derouen was talking to Fontenot at the time of the shooting. Ms. Derouen testified that she was an old friend and former lover of Fontenot, and she had not seen him in many years. They were talking about the death of Fontenot's brother at the time of the shooting, and Fontenot was crying about his brother's death. While she and Fontenot were sitting at the bar, she saw the defendant and Lougon wrestling, and she described Lougon trying to hold back the defendant. At that time, Fontenot had his head down on the bar, crying. Ms. Derouen testified that Fontenot did not get up until the defendant pulled out his gun. Fontenot responded by saying, "Hey," and then the defendant started shooting. According to Ms. Derouen, Lougon and the defendant were wrestling over the gun when the first shot went off.
Marian Bouley had accompanied Ms. Derouen to "The Barn." She saw the defendant pull a "big silver gun" out of his pants, and then saw Lougon and the defendant struggling. Ms. Bouley confirmed that Ms. Derouen was talking with Fontenot at the time of the struggle. Ms. Bouley told Ms. Derouen that "there's going to be a fight in here," and after the first shot was fired, she hid behind the bar.
JoAnn Broussard saw the defendant, Fontenot and Lougon at the bar and testified that no one was shouting, nor did Fontenot make any aggressive moves towards the defendant. In fact, neither Lougon, Elizabeth Derouen, Tamatha Broussard, nor Marian Bouley saw the victim swinging a pool cue at the defendant nor making any aggressive, threatening, or provocative moves or statements towards the defendant.
Two state's witnesses whose testimony about the events of April 15, 1990, differed from the others were Royce Meyers and his wife, Cheryl Oberg Meyers. Royce Meyers testified that he was speaking with the defendant before the shooting and that the defendant appeared fine and was not intoxicated. Royce Meyers did not witness the shooting. Cheryl Meyers gave a detailed account of the shooting which varied greatly from that of the other eye witnesses. She said the defendant was talking with Royce Meyers and then began shooting Fontenot who was at a pool table and not at the bar. Cheryl Meyers contradicted Royce Meyers by saying that Royce Meyers saw all of the shooting.
Counsel for the defendant spent much time impeaching Cheryl Meyers. One defense witness, Darrell Dyson, claimed that he saw Cheryl Meyers pop a white pill in the defendant's mouth shortly before the shooting. No other witness saw this; Cheryl Meyers specifically denied giving the defendant a pill. Elizabeth Derouen who was nearby talking with Fontenot at the bar never saw the defendant get a pill from Cheryl Meyers.
Darrel Dyson further testified that he saw Fontenot swinging a pool cue at defendant, but he did not see the shooting because he said he left the bar shortly before it occurred. Only one other witness testified that he saw Fontenot swinging a pool cue at the defendant, and that was Darren Smith. Smith was another eye witness to the shooting. However, his timing of the victim swinging the pool cue, saying "Hah," the struggle over the gun, and the firing of the gun shots was almost an immediate succession of events while Darrell Dyson's testimony was that there was enough time between Fontenot swinging the cue and saying "Hah," for the defendant to return to a spot around the corner of the bar and for Dyson to leave before the shooting. Marian Bouley, Elizabeth Derouen, Tamatha Broussard, Terry Lougon and JoAnn Broussard all denied that *259 they saw Fontenot playing pool or swinging a pool cue immediately before the shooting.
The victim's blood alcohol content was measured at .167 percent, but only the defendant's witnesses said either defendant or Fontenot acted intoxicated. To Lougon, Tamatha Broussard, JoAnn Broussard, Elizabeth Derouen, Marian Bouley and Cheryl Meyers, both the defendant and Fontenot acted fine, as if they were not intoxicated. Marian Meaux, a cousin of the defendant, testified that she and the defendant drank all afternoon beginning in Lafayette and proceeding to Maurice and then to Geuydan; she testified that the defendant was obviously drunk, but was able to drive from Lafayette to Maurice and then to Gueydan.
The defendant presented Albert Hanks who testified that Cheryl Meyers told him a few weeks after the shooting that the defendant was drunk and Fontenot was going after him. Royce Bonin was also called as an impeachment witness and he testified that Royce Meyers, his nephew, and Cheryl Meyers came to his house the day after the shooting and said that they were leaving because they were scared and that the defendant was drunk or drugged at the time of the shooting. Rita Durand, the defendant's mother, testified that Lougon spoke to her after the shooting and gave a different version of the shooting and told her he was angry at the defendant for shooting Fontenot who was his first cousin.
Melvin Breaux lived next to the lounge and heard four shots fired shortly after 10:00 p.m. He recovered four empty casings and two bullets inside the bar. It was determined that one bullet had entered the body of Fontenot and exited, one bullet was still lodged in his body, and two bullet holes were found in the floor plus one in the ceiling.
Sergeant Norman Schultz was a detective for the Jefferson Parish Sheriff's Office. He assisted in the arrest of the defendant in New Orleans and the recovery of the nickel-plated Smith and Wesson 9 mm semi-automatic pistol from the defendant's car. The defendant and the state stipulated that this gun fired the shots that killed Jasper Fontenot. Sergeant Schultz also testified that at the time that the defendant was arrested, defendant admitted that he had killed someone.
The coroner, Dr. Emil Laga, testified that the cause of death was a fatal gunshot wound to the chest; the bullet entered at the left arm or shoulder of the victim and proceeded through the chest and the aorta and went from right to left and down from front to back. A second gunshot wound entered the lower chest or abdomen and exited through the right hip. Dr. Laga testified that the two bullets followed nearly parallel paths and that it appeared that the victim was standing when he was shot and not lying on the ground. It also appeared that the victim was facing the defendant, but Dr. Laga testified that it was possible that he could have been backing up or walking towards the defendant.

ERROR PATENT REVIEW AND ASSIGNMENT OF ERROR NO. 8
LSA-C.Cr.P. art. 930.8 provides that at the time of sentencing the trial court shall inform the defendant of the prescriptive period for post-conviction relief. The record shows that the trial court did not so inform the defendant. This defect has no bearing on whether the sentence is excessive and thus is not grounds to reverse the sentence or remand the case for resentencing. LSA-C.Cr.P. art. 921. The three year prescriptive period does not begin to run until the judgment is final under LSA-C.Cr.P. art. 914 or 922, so prescription is not yet running. The purpose of the notice of Article 930.8(C) is to inform the defendant of the prescriptive period in advance; thus, the district court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten (10) days of the rendition of this opinion and to file written proof that the defendant has received the notice in the record of these proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3d Cir.), writ denied, 623 So.2d 1334 (La.1993).

ASSIGNMENT OF ERROR NO. 7
This assignment of error contends that the evidence was insufficient to find the *260 defendant guilty of second degree murder. Although the defendant has placed this assignment of error toward the end of his appellate brief, it will be addressed first since it concerns the sufficiency of the evidence to convict the defendant.
The defendant admits that he killed Jasper Fontenot. He also admits that he had specific intent to kill when he shot the victim. The one question in this assignment of error is whether or not the homicide was committed in "sudden passion or heat of blood" and therefore, should be reduced to manslaughter.
Under the Jackson v. Virginia standard of review, when the issue of sufficiency of the evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, supra, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. A determination of the weight of evidence presented is a question of fact. The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witness and is a matter of weight of the evidence and not sufficiency. Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State v. Nolan, 503 So.2d 1186 (La.App. 3d Cir.), writ denied, 507 So.2d 226 (La.1987).
A fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573-74 (1979). Where rational triers of fact could disagree to the interpretation of the evidence, the rational trier's view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
Second degree murder is defined as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1. Therefore, the state had to prove the defendant (1) killed Jasper Fontenot and (2) did so having a specific intent to kill or to inflict great bodily harm.
The evidence is clearly sufficient to find that the defendant shot and killed Jasper Fontenot. Also, the fact that the defendant shot at the victim three to four times evidences that the defendant acted with specific intent to kill or to inflict great bodily harm. We find that the evidence against the defendant supports the verdict of guilty of second degree murder.
In order to reduce a first or second degree murder to manslaughter, the homicide must be committed in such passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation will not reduce a homicide to manslaughter if the trier of fact finds that the defendant's blood had actually cooled, or that an average person's blood would have cooled at the time that the homicide was committed. State v. Lee, 498 So.2d 1177 (La.App. 3d Cir.1986), writ denied, 504 So.2d 874 (La. 1987).
The defendant argues that because not a single state's witness testified that the defendant had any premeditated plan or intention to kill Jasper Fontenot, it "leads to the inescapable conclusion that the defendant acted on the spur of the moment out of extreme provocation." The defendant contends that Jasper Fontenot's teasing and taunting of the *261 intoxicated defendant in a lounge full of patrons was sufficient provocation within the meaning of LSA-R.S. 14:31(A)(1).
By its verdict, the jury rejected the defendant's evidence that Jasper Fontenot had been teasing and taunting the defendant or making any threatening gestures towards him immediately before the shooting. This is a credibility determination of the jury and should not be disturbed on appeal in the absence of an abuse of discretion.
The defendant also makes much of the fact that the verdict was ten to two and not unanimous. LSA-C.Cr.P. art. 782 requires that a verdict of guilty of second degree murder must be by a vote of ten out of twelve jurors; a unanimous jury verdict is not required nor does it establish any doubt as to the validity of the verdict.
Therefore, this assignment of error is without merit. The evidence presented at trial was sufficient to support the defendant's conviction of second degree murder.

ASSIGNMENT OF ERROR NO. 1
By this assignment of error, the defendant contends that the trial court erred in denying his motion to change venue from Lafayette Parish.
As noted previously, defendant's Motion to Change Venue from Vermilion Parish was granted after the defendant's first trial ended in a mistrial; voir dire established that no fair and impartial jury could be selected from Vermilion Parish.
On September 30, 1992, Judge Simon signed an order transferring venue from Vermilion Parish to Lafayette Parish. The defendant never filed a motion to change this new venue nor objected until the first day of trial on February 1, 1993.
The defendant's motion was based upon the close proximity of Vermilion and Lafayette Parishes and the problem of selecting a fair jury since the defendant's present second degree murder charge and the defendant's separate first degree murder charge had generated much publicity in the local media. At the time that the defendant orally moved to change venue, the trial judge deferred ruling on this issue until after voir dire or during voir dire if the issue once again presented itself.
The defendant and the state selected a twelve person jury and the defendant had to exercise only seven of his thirteen peremptory challenges. At the end of jury selection, the defendant did not re-urge his motion to change venue nor did he make any objection on this issue. Therefore, there was no ruling by the trial court on this issue.
LSA-C.Cr.P. art. 622 sets forth the grounds for change of venue in pertinent part, as follows:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
The manner in which a motion for change of venue is filed is set forth in LSA-C.Cr.P. art. 621:
A motion for a change of venue may be filed by either the state or the defendant. It shall be filed in accordance with Article 521; or thereafter, in the discretion of the court, any time before the first witness is sworn at the trial of the merits. The motion shall be in writing, sworn to by mover or his counsel, and shall contain:
(1) Allegations of fact upon which the motion is based; and
(2) A statement that the motion is not made for the purpose of delay, but to obtain a fair and impartial trial.
A contradictory hearing shall be held upon the motion.
At the outset, it is obvious that the defendant failed to comply with the requirements of Article 621. The motion was not in writing and not timely. Unless permitted by the trial court, the motion must be filed in accordance with LSA-C.Cr.P. art. 521. It does not appear that the defendant had any reason to wait over four months to object to the new venue. Also, the defendant could have prepared a written motion. The Louisiana Supreme Court has found such non-compliance sufficient to preclude appellate *262 review of any objections to venue. See State v. Sosa, 328 So.2d 889, 891 (La.1976) (oral motion); and State v. Shamblin, 301 So.2d 320, 321 (La.1974) (motion filed on day of trial was untimely).
Not only has the defendant precluded appellate review of this issue by non-compliance with LSA-C.Cr.P. art. 621, but he has also done so by his failure to re-urge his motion during or after voir dire. In State v. Brogdon, 426 So.2d 158 (La.1983), the supreme court was faced with an identical problem. When the trial court deferred ruling on Brogdon's motion to change venue, the defendant did not object and he did not re-urge his motion after voir dire. No evidence was adduced by the defendant in support of his motion. The Louisiana Supreme Court ruled that it was manifestly unfair to allow the defendant to remain mute on the matter at trial and subsequently raise it on appeal after an unfavorable verdict.
The burden of proof is on the defendant to prove that there exists such a prejudice in the collective minds of the people of the community that a fair and impartial trial is impossible. The court in Brogdon concluded:
"Because the defendant failed to object to the actions of the trial judge in deferring final disposition of the venue question until voir dire, and because the defendant failed to raise again the motion at the time of voir dire despite the invitation of the trial judge, it is impossible for us to say that the defendant proved the existence of such prejudice that a change of venue should have been granted." Id. at p. 165.
In the present case, defendant Bourque was able to select a jury exercising only seven out of his thirteen peremptory challenges. Six jurors were excused for cause. A review of voir dire reveals that the press coverage of the defendant's case did not prejudice the collective mind of the community to the point that the defendant could not receive a fair and impartial trial.
Therefore, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
By this assignment of error, the defendant contends that the trial court erred in denying his motion to sequester the jurors upon selection of the jury.
LSA-C.Cr.P. art. 791(C) provides:
In non capital cases, the jury shall be sequestered after the court's charge and may be sequestered at any time upon order of the court.
In State v. Williams, 445 So.2d 1171 (La. 1984), the court ruled that:
"The trial court has discretion to decide whether or not to sequester a jury in a non-capital case. C.Cr.P. 791(C). The purpose of sequestering jurors is to protect them from outside influence and from basing their verdict upon anything other than evidence developed at trial. State v. Marchand, 362 So.2d 1090 (La.1978)." (Footnote omitted.)
Id. at 1176.
See also State v. Maze, 596 So.2d 218, 219 (La.App. 3d Cir.), writ denied, 604 So.2d 963 (La.1992).
The defendant contends that the proximity to the location of the homicide and the previous problems of the selection of a jury in Vermilion Parish established an abuse of discretion by the trial court. Further, the defendant claims that the publicity generated by the trial influenced the jury. A review of voir dire reveals no problems arising from the previous trial or the proximity to the site of the crime. Defendant cites no authority for these factors mandating sequestration. Also, the defendant complains about the influence of publicity; yet, he objected to a voluntary "gag" on comments to the media by the attorneys during the trial.
The trial court carefully admonished the jury not to read, watch or discuss anything about the trial once they left the courtroom. The defendant points to no evidence that the judge's admonishments were disregarded or that the defendant suffered any prejudice to his right to a fair trial.
Therefore, this assignment is meritless.

*263 ASSIGNMENT OF ERROR NO. 3

This assignment of error concerns a novel argument of double jeopardy.
Shortly after the defendant committed the murder of Jasper Fontenot, he fled to the home of his estranged girlfriend, Charlotte Perry, and murdered Charlotte Perry and attempted to murder Charlotte Perry's mother. For these crimes, the defendant was charged with first degree murder and after trial, he was found guilty as charged and ultimately sentenced to death.
While the defendant's appeal of his conviction and death sentence was pending before the Louisiana Supreme Court, the defendant was tried and convicted for the present murder. The defendant filed a motion to quash based upon double jeopardy and this motion was denied by the trial court.
On July 1, 1993, the Louisiana Supreme Court affirmed the defendant's conviction for the first degree murder of Charlotte Perry but reversed his death sentence and remanded the case for a new sentencing hearing. State v. Bourque, 622 So.2d 198 (La.1993). The reason for the remanding of the case for a new sentencing hearing was because the state introduced so much evidence of the defendant's murder of Jasper Fontenot that it injected an arbitrary factor into the sentencing proceedings. The court explained:
"While this court has determined the state may present evidence of unrelated unadjudicated crimes charged against a defendant in order to show the defendant's character and propensities, that authority is not unlimited. In [State v.] Jackson [608 So.2d 949 (La.1992)], this court imposed restrictions on this type of evidence "in order to insure that due process is not violated by the injection of arbitrary factors into the jury's deliberations and to prevent a confusing or unmanageable series of mini-trials of unrelated and unadjudicated conduct during the sentencing hearing." Id., 608 So.2d at 955.
* * * * * *
"Excepting the testimony of one witness who testified regarding the instant offense, the state produced no other evidence of the character of the defendant. In short, the state presented a prohibited "mini-trial" on the issue of the defendant's guilt or innocence of the killing of Jasper Fontenot."
Bourque, 622 So.2d at 247-48.
In his motion to quash and appellate brief, the defendant claims that the earlier first degree murder trial's penalty phase at which extensive evidence of the defendant's murder of Jasper Fontenot was introduced should operate as a double jeopardy bar to the defendant's subsequent trial for the murder of Jasper Fontenot.
The prohibition against double jeopardy is found in the Fifth Amendment to the United States Constitution, in Louisiana Constitution Art. I § 15, and in LSA-C.Cr.P. art. 591.
Defendant further cites the cases of Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), and Poland v. Arizona, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). These cases concern double jeopardy claims arising in first degree murder cases remanded for a new trial or sentencing hearing as a result of an error of law.
In Bullington, the defendant's conviction was reversed because Missouri law allowed the automatic exemption of women from jury duty and on retrial, the state sought the death penalty. The Court ruled that the jury in the first trial "acquitted" the defendant of the death penalty when it recommended life imprisonment, and therefore, the double jeopardy prohibition prevented the state from again seeking the death penalty in the new trial.
In Poland, the defendant received the death penalty when the trial court found one out of two possible aggravating circumstances, but on appeal, the trial court's interpretation of law was deemed erroneous and the case was remanded for a new sentencing hearing. The defendant in Poland had not been acquitted of the death penalty in the first trial; therefore, there was no double jeopardy bar to the state again seeking the death penalty.
Scott Bourque now argues that the sentencing proceeding in the first degree murder trial in St. Martinville contained all of *264 the elements of the homicide in the present case and, as such, constitutes double jeopardy. Because the exact facts presented at the sentencing hearing were also presented at the second degree murder trial, the defendant claims that he is being twice punished for the same offense.
The state countered the defendant's argument with first acknowledging that Bourque's death sentence had been reversed and remanded because of the extent of the evidence introduced concerning Jasper Fontenot's murder. The state also argued that a penalty phase of a first degree murder trial is not a "trial" for the purposes of double jeopardy. Cited in support was Poland in which the Supreme Court expressly said that it would not extend the rule in Bullington:
"We are not prepared to extend Bullington further and view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance. Such an approach would push the analogy on which Bullington is based past the breaking point.
"Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts of death and life imprisonment. 451 U.S., at 438, 101 S.Ct., at 1858. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself "convict" a defendant (i.e., require the death penalty), and the failure to find any particular aggravating circumstance does not "acquit" a defendant (i.e., preclude the death penalty)."
Poland, 476 U.S. at 155-56, 106 S.Ct. at 1755.
In 1992, the United States Supreme Court ruled that the overlap of proof between two prosecutions does not establish a double jeopardy violation. U.S. v. Felix, ___ U.S. ___, ___, 112 S.Ct. 1377, 1382, 118 L.Ed.2d 25 (1992). In Felix, the defendant was prosecuted for attempting to manufacture methamphetamine in Missouri. The state refuted his claim that he never intended to use the precursor chemicals and equipment to manufacture methamphetamine. The government introduced evidence of Felix's earlier participation in a methamphetamine manufacturing operation in Oklahoma which had been shut down by a government raid. Felix was convicted in Missouri and at his later trial in Oklahoma for his participation in the methamphetamine manufacturing. He claimed double jeopardy since the same evidence used at the second trial in Oklahoma had been used previously at the first trial in Missouri. The Supreme Court rejected this argument and ruled "[a]t the Missouri trial, the Government did not in any way prosecute Felix for the Oklahoma methamphetamine transactions; it simply introduced those transactions as prior acts evidence under Rule 404(b)." Felix, ___ U.S. at ___, 112 S.Ct. at 1383.
At the first degree murder trial in St. Martin Parish, Scott Bourque was not prosecuted for the murder of Jasper Fontenot, nor was he punished for the murder of Jasper Fontenot. The evidence of the defendant's murder of Jasper Fontenot was introduced to show his character and propensity to violence and to be considered by the jury in determining the defendant's sentence for the first degree murder of Charlotte Perry. Therefore, the double jeopardy prohibition has not been violated.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 4, 5 AND 6
These three assignments of error are so interrelated and their issues overlap to the point that their discussion will be combined.
The defendant pled "not guilty" to the charge of second degree murder on July 3, 1990. On April 16, 1992, the defendant argued motions to obtain funds to secure the attendance of expert psychiatric witnesses. The court minutes mentioned that the court "appointed" these doctors to examine the defendant, but no sanity commission was requested and no sanity hearing was conducted. On July 1, 1992, the defendant filed a LSA-C.Cr.P. art. 726 notice of intent to introduce evidence of a mental condition. Nothing else happened on this issue until February 1, 1993, when trial began.
*265 After jury selection, the state filed a motion in limine to exclude expert testimony that a mental condition of the defendant precluded specific intent necessary for a second degree murder. The state cited LSA-C.Cr.P. art. 651 and the fact that the defendant never pled "not guilty and not guilty by reason of insanity." In argument to the trial court, the defendant contended that he had a mental condition which mitigated second degree murder down to manslaughter. However, the trial court relied upon State v. Johnson, 475 So.2d 394 (La.App. 1 Cir.), writ denied, 478 So.2d 143 (La.1985) to grant the state's motion and exclude this psychiatric evidence. The defendant thereafter requested to change his plea from "not guilty" to "not guilty and not guilty by reason of insanity," but the trial court denied this request. The defendant sought supervisory writs of review from the Third Circuit Court of Appeal and the Louisiana Supreme Court, both of which denied relief. State v. Bourque, an unpublished writ opinion bearing docket No. K93-99 (La.App.3d Cir. February 3, 1993), writ denied, 612 So.2d 67 (La.1993). This court's ruling stated:
"WRIT DENIED: There is no error in the trial court's ruling. See State v. Johnson, 475 So.2d 394 (La.App. 1 Cir.1985), writ denied, 478 So.2d 143 (La.1985); State v. Fisher, 380 So.2d 1340 (La.1980)."
The prior denial of supervisory writs does not bar reconsideration of this issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion on the issue. State v. Fontenot, 550 So.2d 179 (La.1989); State v. Decuir, 599 So.2d 358 (La.App. 3d Cir.), writ denied, 605 So.2d 1095 (La.1992). Generally, when a defendant does not present any new evidence on this issue after the pretrial ruling on the issue, the issue can be rejected on appeal. See e.g., State v. Regan, 601 So.2d 5 (La.App. 3d Cir.1992), writ denied, 610 So.2d 815 (La. 1993); State v. Wright, 564 So.2d 1269 (La. App. 4th Cir.1989). Judicial efficiency demands that this court accord great deference to its pretrial decision unless it is apparent that the determination was patently erroneous and produced unjust results. State v. Decuir, 599 So.2d at 360.
We will discuss the issues raised in the previous writ and now on appeal. Assignment of error number four contends that the trial court erred in refusing to allow the defendant to change his plea from "not guilty" to "not guilty and not guilty by reason of insanity." LSA-C.Cr.P. art. 561 provides:
The defendant may withdraw a plea of "not guilty" and enter a plea of "not guilty and not guilty by reason of insanity," within ten days after arraignment. Thereafter, the court may, for good cause shown, allow such a change of plea at any time before the commencement of the trial.
In State v. Fisher, 380 So.2d 1340, 1345 (La.1980), the Louisiana Supreme Court held that a defendant could not change her plea after trial commenced, i.e., after the first prospective juror had been called for examination. LSA-C.Cr.P. art. 761. See also, State v. Anseman, 607 So.2d 665, 670 (La. App. 5th Cir.1992), writ denied, 613 So.2d 989, 990 (La.1993).
When defendant Bourque requested to change his plea, the jury had been sworn and his request was untimely. Therefore, the trial court did not abuse its discretion because it no longer had any discretion in this matter.
Assignments of error numbers five and six concern the trial court granting of the motion in limine by the state, and refusing to allow defendant's experts to testify that the defendant's mental condition could mitigate the defendant's crime from second degree murder to manslaughter.
Counsel for defendant claimed that the medical experts would testify that defendant's psychological background, which included various degrees of abuse and chemical dependency, along with the defendant's mental faculties, made it very likely that the defendant acted out of "sudden passion and/or heat of blood" and this testimony would have been enough to reduce the grade of the offense from second degree murder to manslaughter. The defendant does not deny that he was sane and that he had the requisite specific intent to kill the victim; instead, defendant claims that he acted in "heat of *266 blood or sudden passion." Defendant further contends that after giving notice as required by LSA-C.Cr.P. art. 726, his experts should have been allowed to testify about these mitigating circumstances arising from the defendant's mental conditions, even though the defendant was not seeking to avail himself of the insanity defense or claim lack of specific intent.
LSA-C.Cr.P. art. 651 provides, in pertinent part, as follows:
When a defendant is tried upon a plea of "not guilty", evidence of insanity or mental defect at the time of the offense shall not be admissible.
Therefore, evidence of a mental defect at the time of the offense is admissible only if a defendant pleads "not guilty and not guilty by reason of insanity."
The arguments presented by counsel for defendant are not novel. Over ten years ago, the Louisiana Supreme Court issued a series of opinions concerning the defense of diminished responsibility or partial insanity, the effect of LSA-C.Cr.P. art. 651, and the constitutionality of this statutory scheme. In State v. Jones, 359 So.2d 95 (La.1978), cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708 (1978), the defendant attempted to argue that her neurotic, prone-to-hysteria mental condition precluded specific intent required for second degree murder in the same manner that intoxication could preclude the formation of specific intent, and thus required a verdict of manslaughter. The Louisiana Supreme Court upheld the trial court's refusal to allow this argument in the absence of a plea of "not guilty and not guilty by reason of insanity," noting the following:
"Louisiana is among the minority of eleven states that still reject the defense in all aspects. In Louisiana, a mental defect or disorder, short of legal insanity (i.e., the incapability to distinguish between right and wrong, La.R.S. 14:14), cannot serve to negate the specific intent and reduce the degree of the crime. State v. Johanson, 332 So.2d 270 (La.1976); State v. Berry, 324 So.2d 822 (La.1975); State v. Rideau, 249 La. 1111, 193 So.2d 264 (1966)."
Jones, supra, 359 So.2d at 98.
The next year in State v. Lecompte, 371 So.2d 239 (La.1979), the court dealt with a case in which the defendant admitted he was sane, but he wanted to introduce psychiatric testimony about his mental history to show an absence of specific intent. After quoting LSA-C.Cr.P. art. 651, the court explained:
"Under this statute, evidence of a mental condition or defect is inadmissible when the defendant failed to plead not guilty and not guilty by reason of insanity. Moreover, a mental defect or disorder short of insanity cannot serve to negate specific intent and reduce the degree of the crime.
* * * * * *
"Initially, we note that specific intent is an ultimate legal conclusion to be resolved by the fact finders. Because an `expert witness must state the facts upon which his opinion is based,' we can reasonably deduce that the testimony of an expert in psychiatry and psychoanalysis concerning the defendant's lack of specific intent would necessarily include testimony of a mental defect or condition. See LSA-R.S. 15:465. Stated another way, in order for the physician to testify as to the effect, no specific intent, she would testify as to the cause, mental condition. This is true even when he asserts (for the first time in brief) that the testimony would prove the absence of specific intent as a defense as distinguished from the inability to form specific intent.
"We hold, therefore, that Louisiana Code of Criminal Procedure Article 651 precludes admission of an expert's testimony concerning the absence of specific intent when the defendant's plea is not guilty."
Lecompte, supra, 371 So.2d at 243.
On rehearing, Justice Blanche further explained:
"Louisiana has adopted the `M'Naughten rule,' which sets forth the test by which a person can be exonerated from the responsibility of his criminal acts because of a mental deficiency or illness which prevents him from distinguishing between right and wrong. The codification of that rule is found in LSA-R.S. 14:14, and in finding *267 that the rule was not constitutionally offensive, Justice Tate in State v. Berry, 324 So.2d 822 (La.1976), stated:
`Our legislature has by La.R.S. 14:14 expressly adopted the M'Naughten test of insanity. We are cited to no authority by reason of which such adoption is beyond its power or offends constitutional guarantees. Whether wise or unwise, this legislative choice does not admit of judicial substitution of another test allegedly more scientifically based on modern psychiatric knowledge.' (State v. Berry, 324 So.2d at 825)"
Lecompte, supra, 371 So.2d at 245.[1]
Still later in 1979, the supreme court discussed what effect the enactment of LSA-C.Cr.P. art. 726 would have on the rule of LeCompte. LSA-C.Cr.P. art. 726 provides:
A. If a defendant intends to introduce testimony relating to a mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall not later than ten days prior to trial or such reasonable time as the court may permit, notify the district attorney in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other orders as may be appropriate.
B. If there is a failure to give notice as required by Subsection A of this Article, the court may exclude the testimony of any witness offered by the defendant on the issue of mental condition.
In State v. Wade, 375 So.2d 97 (La.1979), cert. denied, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 249 (1980), the sole issue was the defendant's right to introduce psychiatric testimony concerning his ability or lack of ability to formulate specific intent.
"[W]e do not find that due process is offended by the Louisiana rule that a defendant cannot rebut evidence of specific intent by presentation of psychiatric testimony, without pleading not guilty by reason of insanity.
"Nor do we find persuasive the defendant's contention that this rule, essentially founded on La.C.Cr.P. art. 651 and La.R.S. 14:14 (both referred to above), was intended to be legislatively modified by a provision of our criminal discovery act adopted in 1977. La.C.Cr.P. art. 726 A (1977) requires notice to the state by a defendant if `[he] intends to introduce testimony relating to a mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense charged.'
"The purpose of the notice requirement of Article 726 A is merely to require discovery of the intent to use such evidence (when admissible, as on a plea of insanity), not to provide substantively for its admissibility on the issue of specific intent."
Wade, 375 So.2d at 98.
Therefore, the fact that counsel for defendant gave the notice required by LSA-C.Cr.P. art. 726 did not dispense with the requirement of law that the defendant plead "not guilty and not guilty by reason of insanity" before any evidence of a mental defect or condition could be admitted at trial.
The defendant attempts to distinguish these cases plus other cases such as State v. Johnson, supra, and State v. Bell, 543 So.2d 1013 (La.App. 3d Cir.1989), by arguing that he was not attempting to prove that he lacked specific intent or was unable to form specific intent; rather, defendant admits that he had the requisite specific intent to kill. What the defendant wanted to do was to prove by psychiatric testimony that his psychological background of abuse and chemical dependency, together with his mental faculties, made it very likely that he killed Jasper Fontenot out of "sudden passion and/or heat of blood" and such testimony would have reduced the grade of the murder to manslaughter.
Manslaughter is defined by LSA-R.S. 14:31(A)(1) as:

*268 (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;
The measure of the adequacy of the provocation to cause a defendant to act in "sudden passion or heat of blood" is the average or ordinary person, and not the peculiar psychological characteristics of a particular defendant. In both State v. Johnson, 475 So.2d 394 (La.App. 1 Cir.), writ denied, 478 So.2d 143 (La.1985), and State v. Ducksworth, 496 So.2d 624 (La.App. 1 Cir.1986), the defendants attempted to introduce psychiatric testimony that their "paranoid trends" caused them to distort reality, or have an altered perception of reality, and these mental defects caused them to commit the murders in the "sudden passion or heat of blood." Johnson, 475 So.2d at 397-48; Ducksworth, 496 So.2d at 630-31. This defense theory was rejected in both cases based upon the clear wording of the manslaughter statute and, in the case of Johnson, the defendant's failure to plead "not guilty and not guilty by reason of insanity."
For the same reasons, the defendant's arguments are also rejected not only because the defendant failed to plead "not guilty and not guilty by reason of insanity," but also because the definition of manslaughter requires the defendant's action be measured by the average person's standard and not the particular psychological variances of a particular defendant.
Finally, the state did not waive its objection to the admissibility of the psychiatric evidence by waiting until the end of jury selection to file its motion in limine. In State v. Ketchens, 552 So.2d 485 (La.App. 4th Cir. 1989), writ denied, 559 So.2d 135 (La.1990), cert. denied, 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 533 (1990), the defendant requested the appointment of a sanity commission to examine him both on his mental capacity to proceed to trial and his sanity at the time he committed the offense, but the defendant did not change his "not guilty" plea to "not guilty and not guilty by reason of insanity." Therefore, any evidence of the defendant's sanity was inadmissible. LSA-C.Cr.P. art. 651. The defendant in Ketchens argued that the state's failure to object to the order appointing a sanity commission precluded it from later objecting at trial; yet, the defendant in Ketchens never changed his plea between the pretrial motion and trial as in the case of State v. Chinn, 229 La. 984, 87 So.2d 315 (1956), and pursuant to LSA-C.Cr.P. art. 651, this psychiatric evidence was inadmissible. But cf. State v. Wilson, 581 So.2d 394, 397 (La.App. 4th Cir.), writ denied, 588 So.2d 1111 (La.1991) (the admission of evidence of a defendant's insanity despite the lack of a plea of "not guilty and not guilty by reason of insanity" was a harmless formal defect where the state never objected and insanity of the defendant was the only real issue at trial).
Additionally, the defendant was not precluded completely from presenting to the jury the issue of his alleged intoxication and the effect of alcohol consumption on a person's ability to control his anger. Defendant's cousin, Marian Meaux, testified about the amount of alcohol she saw defendant consume in the afternoon and early evening of April 15, 1990. Later, Dr. Joseph Hayes, a medical doctor specializing in the area of addiction medicine, testified that alcohol reduces an individual's inhibitions, or his ability to conform to society's "do's" and "dont's." Therefore, an individual will overreact or underreact to situations if he is under the influence of alcohol.
The law in Louisiana concerning the admissibility of such psychiatric testimony is well settled and has been for many years. The arguments presented by counsel for defendant have been rejected repeatedly for either procedural defects or substantive defects in a theory of defense. Therefore, these assignments of error are meritless.

CONCLUSION
For the above and foregoing reasons, defendant's conviction and sentence are affirmed.
*269 The district court is directed to inform the defendant of the provisions of LSA-C.Cr.P. art. 930.8 relative to post-conviction relief by sending appropriate written notice to the defendant within ten (10) days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of these proceedings.
AFFIRMED WITH INSTRUCTIONS.
NOTES
[1] As the United States Supreme Court recently recognized, psychiatry is an inexact science and the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach...." Medina v. California, ___ U.S. ___, ___, 112 S.Ct. 2572, 2580, 120 L.Ed.2d 353 (1992), quoting Addington v. Texas, 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979).