728 So.2d 416 (1998)
STATE of Louisiana, Plaintiff,
v.
Allison Scott THIBODEAUX, Defendant-Appellant.
No. 97-1636.
Court of Appeal of Louisiana, Third Circuit.
November 18, 1998.
Writ Denied May 7, 1999.
*418 Robert Richard Bryant, Jr., Lake Charles, for State.
Clive Adrian Stafford Smith, New Orleans, for Allison Scott Thibodeaux.
Before WOODARD, PETERS, and GREMILLION, JJ.
GREMILLION, Judge.
The defendant, Allison Scott Thibodeaux, appeals his convictions for the first degree murders of Sadie Landreneau and Nancy Melton, and his sentence of two terms of life imprisonment without benefit of probation, parole, or suspension of sentence to be served consecutively. A jury of twelve unanimously found Defendant guilty as charged, and at the conclusion of the penalty phase of the trial, it recommended he be sentenced to life imprisonment for both convictions. For the following reasons, we affirm.

FACTS
Landreneau and her daughter, Krista Lavergne, lived in a three-bedroom, one-bathroom trailer in Sulphur, Louisiana. Melton occasionally lived with them, and Krista called her Aunt Nancy. Defendant would come over to the Landreneau trailer to see Melton, his on-again, off-again, girlfriend. Shella Linscomb and Ottis Russell lived next door to the Landreneau trailer. The evidence shows that at approximately 4:00 a.m. September 1, 1993, nine-year-old Krista awoke from her sleep when she heard screaming. She got out of bed and went down the hall to the bathroom and saw Defendant holding her mother against the bathroom wall. According to Krista, Defendant was telling Landreneau, "You're dead, you're dead." Krista testified that Defendant was naked and the front of her mother was covered in blood. When Krista saw this, she ran out of the trailer screaming.
Russell and Linscomb had awakened at 3:30 a.m. to go shrimping. Krista knocked on the door of their trailer at approximately 4:00 a.m., and told the couple that Defendant was hurting her mother and to call 911. Linscomb went outside, and, as she stood near the Landreneau trailer, she could hear Landreneau "hollering, screaming" and the voice of a man.
Linscomb went back to her trailer and called the police. After the call was made, Russell walked over to the Landreneau trailer and heard moaning coming from the area of the kitchen. After Russell returned to the Linscomb trailer, Linscomb stepped outside and waited for the police. Krista and Russell stayed on the front porch. As the first police officer arrived, Defendant, who was naked and "full of blood," came out of the Landreneau trailer and entered a white pick-up truck. Both Linscomb and Krista recognized the naked man as Defendant.
*419 Sergeant Vinetta Briscoe was the first police officer to arrive at the Landreneau trailer. As she pulled into the driveway, she saw a woman pointing to a white Dodge pick-up truck and saying, "that's the guy right there; he's in there; and he's naked." She then saw a white male wearing a red baseball cap in the pick-up truck drive off through the Linscomb backyard as soon as she started to get out of her patrol car. Defendant drove several blocks before pulling into the driveway of another trailer and fleeing on foot.
By this time, other police officers had joined in the pursuit of Defendant. Captain Roy Miles tried to stop Defendant while he was running down the street; Defendant was naked and covered with blood, and refused to halt when ordered. At the same time, Krista and Linscomb went into the Landreneau trailer, saw the bloodied body of Landreneau in the kitchen, and left to call 911 to request an ambulance. Captain Miles left the pursuit of Defendant and returned to the Landreneau trailer where he confirmed that there were two dead women inside. One was lying on the kitchen floor with numerous stab wounds, and the other was lying on a bed in a bedroom where she had also been stabbed to death. Her body had been mutilated; her breasts were amputated with one stuffed in her mouth and the other in her vaginal canal. At this point the police knew Defendant was a suspect in a double homicide, and they intensified their search.
Eventually, Sergeant Briscoe, Patrolman Patrick Johnson, Captains Miles and Moss found Defendant hiding in a shed behind a trailer. They ordered him to come out of the shed, and, as soon as he did, Officer Johnson handcuffed him and read him his Miranda rights. As Officer Johnson was reading him his rights, Defendant kept saying, "I didn't do it, I didn't do it." Defendant also told them that someone had bumped him on the head and knocked him out. While in route to the Sulphur Police Department, Defendant told Officer Johnson that he was having sex with his girlfriend when someone broke in, hit him over the head, and knocked him unconscious. At the police station, Defendant asked how the victims were.
Detective Manny McNeal testified Defendant consented to have tissue samples taken from his body. Blood was drawn and swabs of the blood on the exterior of his body were taken. Tests showed that the blood on Defendant's body was the same type as that of Melton.[1] Further tests showed that blood from a t-shirt and a cigarette pack found in Defendant's truck, blue jeans found in the bed of his truck, and blood on the wrist-watch he was wearing were the same types as Melton's and Landreneau's.[2] Evidence from a sexual assault kit that was obtained from the body of Melton revealed the presence of seminal acid and intact spermatozoa in her vagina and vaginal vault. Tests showed that spermatozoa inside Melton was not Defendant's. A further test showed that Defendant, who is approximately five feet tall and weighs about one hundred and five to one hundred and ten pounds, had a blood alcohol level of 0.17, while Melton had a blood alcohol level of 0.14.
Defendant, who was interviewed by Detective McNeal, told him that he was at the Landreneau trailer and had sex with Melton and that they consumed alcohol and he passed out. He then told Detective McNeal that he heard a loud banging noise, and, when he arose and went to the door of the bedroom, he was knocked over the head and rendered unconscious. He could not give Detective McNeal any proof of a head injury such as a knot or lump, and the detective did not see any injury on Defendant's head. Defendant also told him that when he regained consciousness, he got up, went into the hall, and was met by Landreneau. According to Defendant, she was very excited, screaming and hollering, and he grabbed her to try to determine why she was in such a state. He said he and Landreneau ended up "coming off the walls" while going down the hall and out the front door. He then told the detective, "I'm sure the neighbor told you that we were hanging out the door." Defendant told Detective McNeal he fled the scene because he knew that the police would think he was *420 responsible because of what occurred between him and Landreneau. He claimed that the struggle he had with Landreneau was the reason why he had blood on his body. When Detective McNeal asked him if he could explain why Melton's blood was also on his body, he had no explanation and ended the conversation.
Dr. Terry Welke performed the autopsies of the victims. He testified that Landreneau suffered sixty stab wounds, including numerous defensive wounds to her hands and arms from attempting to shield herself from the stabbings. She died from multiple stab wounds to her head, neck, back, arms, and hands, including a cut to her neck which severed major arteries, her voice box, and cut all the way to her spine. She also suffered several blunt force injuries to her head.
Melton died from multiple stab wounds of the neck and chest. She also suffered from bruises to her face and chest prior to her death. The extent of the blunt force injuries to her face and head indicated that she may have been beaten unconscious. With the exception of one scrape on Melton's arm, there were no defensive wounds. From the lack of blood at the site where Melton's breasts were severed, the coroner surmised that the mutilation occurred subsequent to her death.
From his inspection of the crime scene, the coroner could tell that Melton was killed in the bed where her body was discovered, but that Landreneau suffered most of her injuries in other parts of the trailer, and her neck was slit in the kitchen. The wounds to Landreneau's back and chest did not kill her instantly, and she would have been able to scream, but for the cut to her throat that severed her voice box.
At the conclusion of the guilt phase of the capital murder trial, the jury found Defendant guilty of two counts of first degree murder. At the conclusion of the penalty phase, the jury unanimously agreed to sentence him to life imprisonment without benefit of probation, parole, or suspension of sentence for each murder.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant's first assignment of error attacks the admission of forty-six photographs of the victims taken at the scene of the crime and during the autopsies. After two pretrial hearings on the admissibility of the photographs, the trial court denied Defendant's motion to exclude the photographs. Defendant objected during the trial to the admission of the photographs, but his objection was overruled.
At a pretrial hearing, Defendant presented a study performed by two professors at the University of Southwestern Louisiana to prove that the photographs were too prejudicial. He also offered to present alternative 3" × 5" black and white photographs. Finally, he argued that the "moral force" of the State's case was not relevant in the guilt or culpability stage of the trial.
As Justice Tate once noted, "There are unfortunately few delicate methods of committing murder...." State v. English, 367 So.2d 815, 823 (La.1979). In the present case, the methods by which Defendant murdered his two victims were extremely savage and brutal. He slit the throat of one of his victims after he had severely beaten her, and then mutilated her body by severing her breasts and stuffing one in her mouth and the other in her vaginal canal. He stabbed the other victim sixty times before he slit her throat so deeply that he cut through to her spine. A natural consequence of these methods of killing was that large amounts of blood were splattered throughout the trailer.
Defendant argues the primary issue in the case was who killed the victims. He denied committing the murders, and further argues that if the jury believed he killed the victims, then the sole remaining issue was the assessment of his state of mind.
Postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death and placement of wounds, and to provide positive identification of the victim. Furthermore, the State is entitled to use photographs to show the location and nature of all the victims' wounds, how the attack occurred, and whether the victims posed any threat to the defendant *421 that would justify an attack. State v. Robertson, 97-0177 (La.3/4/98); 712 So.2d 8. Photographic evidence is properly admitted unless it is so gruesome that it overwhelms the jurors' reason and leads them to convict without sufficient other evidence, i.e. when the prejudicial effect of the photographs substantially outweighs their probative value. State v. Koon, 96-1208 (La.5/20/97); 704 So.2d 756; State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).
Such a situation was presented to the court in State v. Morris, 245 La. 175, 157 So.2d 728 (La.1963), the only case we have found which was reversed because the trial court admitted prejudicially gruesome photographs. In Morris, the trial court admitted crime scene photographs and photographs taken before and during the autopsy of the victim. The victim had been shot four times in the abdomen and his death resulted from the wounds to the abdomen. The objectionable photographs were those taken during the autopsy that showed the lengthy incision of the abdomen, laying bare the inner portions of the body and the suction apparatus evacuating blood from the body cavity, plus other photographs of the coroner holding up various internal organs. The Louisiana Supreme Court found that the photographs of the autopsy procedure had no real evidentiary value, were highly shocking and emotionally disturbing to the mind of the average individual, revolting to the members of the jury, and influenced them in arriving at a verdict that carried a mandatory death sentence; thus, the inherently prejudicial photographs should have been excluded. In arriving at its decision, the supreme court explained:
Of course, we have on numerous occasions stated that the mere fact that photographs are gruesome and tend to prejudice the jury does not render them inadmissible in evidence if they are otherwise admissible.... `Ordinarily photographs are not inadmissible merely because they bring vividly to jurors the details of a shocking crime or tend to arouse passion or prejudice, as in the case of unpleasant, gruesome, or horrifying photographs. The test of admissibility in such cases is whether the probative value of the photographs out-weighs their probable prejudicial effect. Accordingly, photographs should be excluded where their logical relevancy will unquestionably be overwhelmed by the inherently prejudicial nature of the particular picture; and photographs which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if they are entirely irrelevant or not substantially necessary to show material facts or conditions.'
Id. at 731(citations omitted) (emphasis provided).
The previously cited case of Robertson, 712 So.2d 8, is similar to the present case. In Robertson, the defendant used a thirteen-inch butcher knife to hit, cut, slash, and stab a seventy-six-year-old man in his eye, face, throat, and chest so many times that the coroner could not count the stab wounds to the face. Eight stab wounds to the chest hit vital organs and major blood vessels, severed eight ribs, and caused the victim to bleed to death. The defendant in Robertson then attacked the victim's seventy-one-year-old wife, stabbing her multiple times in the back and chest, and severing several of her ribs. Like her husband, the elderly wife bled to death and blood was splattered on the ceiling and walls of both bedrooms where the victims were killed. The supreme court refused to reverse the defendant's conviction and sentence.
Any excessiveness in the number of photographs introduced is solely a result of the numerosity and multiple locations of the wounds inflicted on Morris and Kazuko Prestenback. The State is entitled to use photographs to show the location and nature of all the victim's wounds. The autopsy photos were particularly necessary to show the numerous stab wounds on the victims. The photos of the location of Mr. Prestenback's body were relevant to convey to the jury how the attack occurred, especially in light of defendant's implication he did not attack Morris Prestenback while he was sleeping but in response to aggression by Prestenback. The photos of the location of Mrs. Prestenback's body, in her bed, were relevant to the State to show *422 she posed no harm to defendant which would justify his attack on her, certainly a factor relevant in the penalty phase. Close-ups of the wounds to Morris Prestenback, who was stabbed and cut so many times in and about the face that the pathologist could not estimate the number, not to mention the numerous stabs to his chest area, were necessary for the State to prove the aggravating circumstance that the murder was committed in an especially heinous, atrocious, or cruel manner. The trial court did not err in introducing these photographs as their probative value outweighed any prejudicial effect they may have had on the jury.
Id. at 32.
The mere fact that the crime scene photographs are unpleasant, horrifying, or gruesome does not render them inadmissible, nor does the fact that the photographs bring vividly to the jurors the details of a shocking crime. The key is that the probative value of the photographs outweighs their prejudicial effect. The photographs in the instant case depict the crime scene unlike the gratuitous shock value of the autopsy photographs introduced in Morris. It would strain logic to find that photographs of a crime scene, in this case a death scene, would have less probative value than prejudicial effect. The State is entitled to present all facets of its case, and the cause and method of death, even though gruesome, should be made available to the jury to prove material facts and conditions. Thus, we find that the trial court did not err in admitting the photographs of the crime scene and autopsy.
At the conclusion of Defendant's argument under this assignment of error, he contends he was unfairly prevented from reducing the prejudicial impact of the photographs during voir dire examination of the prospective jurors. Defendant wanted to show prospective jurors the photographs in question so that he could best decide whether he should exercise a challenge and excuse the prospective juror. However, the trial court denied his request relying on State v. Bibb, 626 So.2d 913 (La.App. 5 Cir. 11/10/93); writs denied, 93-3127 (La.9/16/94); 642 So.2d 188, 93-3127 (La.10/28/94); 644 So.2d 648. In Bibb, the defendant was charged with two counts of first degree murder in the deaths of his young children, and he wanted to show prospective jurors the photographs of the children with their throats slashed to test the possible prejudicial influence upon the prospective jurors. The trial court in Bibb refused to allow the exhibition of evidence during the voir dire, and the appellate court affirmed, stating:
Although an accused in Louisiana has the right to full voir dire examination of prospective jurors, the scope of the examination during voir dire shall be within the discretion of the trial court. However, because the right to full voir dire examination has a constitutional basis, wide latitude should be given the defendant to test prospective jurors' competency and impartiality. Nevertheless, the purpose of voir dire examination is not to elicit jurors' opinions concerning particular evidence to be offered at trial.
Id. at 942 (citations omitted). We, likewise, hold that the ruling of the trial court was correct, and reject this assignment of error as it is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
By his second assignment of error, Defendant contends that the trial court erred in denying his motion to quash the grand jury indictment. The basis for the motion to quash was the alleged discrimination in the selection of the grand jury foreperson. This court addressed this identical claim in an unpublished pretrial writ opinion, State v. Thibodeaux, 95-1284 (La.App. 3 Cir. 10/24/95). The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion on the issue. Generally, when a defendant does not present any new evidence on this issue after the pretrial ruling, the issue can be rejected on appeal. Judicial efficiency demands that this court accord great deference to its pretrial decision unless it is apparent that the determination was patently erroneous and produced unjust results. State v. Bourque, 93-594 (La.App. 3 Cir. 2/16/94); *423 636 So.2d 254, writ denied, 94-1839 (La.1/6/95); 648 So.2d 920.
In the pretrial writ opinion in this case, this court ruled:

WRIT DENIED: There is no error in the trial court's ruling denying the defendant's Motion to Dismiss the Indictment Due to Discrimination in the Selection of Grand Jury Forepersons as defendant does not have standing. State v. Campbell, 95-0824 (La.10/2/95); 661 So.2d 1321.
After the rendition of the writ opinion, the United States Supreme Court reversed the Louisiana Supreme Court and held that a white defendant has standing to object to discrimination against blacks in the selection of grand jury forepersons. Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). In the recent opinion in State v. Langley, 95-1489 (La.4/14/98); 711 So.2d 651, the supreme court remanded the case to the trial court for an evidentiary rehearing on the defendant's claims, raised before trial, that the foreperson of the Calcasieu Parish grand jury that indicted the defendant was selected in an intentionally discriminatory manner. The defendant in Langley was also given the right to appeal to the supreme court from any adverse ruling on the motion. Initially, it would appear that we should remand the present case as was done in Langley. However, at the conclusion of the pretrial hearing, the trial court found that Defendant had standing to attack the racial makeup of the grand jury venire, but that he failed to carry his burden of proof. Therefore, remand is not necessary, and we shall address the issue.
Defendant filed four separate motions to quash the indictment; one specifically attacked the selection of the grand jury foreperson, and the other three motions attacked the composition of the grand jury venire and the proceedings of the grand jury. The hearing on the motions to quash occurred on February 13, 1995. Defendant introduced a list of the grand jury forepersons from 1972 to 1994, and the 1990 census survey of Calcasieu Parish indicating the percentage of blacks and whites. Judge Arthur J. Planchard, the chief judge of the Fourteenth Judicial District Court, testified about the manner of selecting the grand jury foreperson.
At the hearing, Judge Planchard said that the district judge who happens to be serving as the criminal backup judge will select the grand jury foreperson when the State asks for impanelment of a new grand jury. When questioned concerning the criteria used to appoint a grand jury foreperson, Judge Planchard said he looked to see if the person possessed all of the legal qualifications for serving on the grand jury as well as if they were educated, could understand the process, and had no impediments to prevent them from serving. He stated that he sometimes selected someone he knew, but other times selected someone he did not know. Judge Planchard further stated he never selected a foreperson based upon race, gender, or religious preference. The only other witness called by Defendant was Dr. Terry Welke, the coroner, and the purpose of calling him was to establish that the grand jury considered illegal or improper evidence when presented with the case against Defendant.
At the conclusion of the hearing, the trial court denied the motion that specifically attacked the selection of the grand jury foreperson on the basis that Defendant failed to carry his burden of proof as set forth in State v. Young, 569 So.2d 570 (La.App. 1 Cir.1990), writ denied, 575 So.2d 386 (La.1991).[3] The trial court, who was of the opinion that Defendant was on a "fishing expedition," also denied his request to interview the grand jurors and the witnesses who went before the grand jury, and to obtain the transcripts of the grand jury proceedings because Defendant failed to show a particularized need as mandated by State v. Trosclair, 443 So.2d 1098 (La.1983), cert. dismissed, 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984).
The trial court issued its first written ruling on March 3, 1995, denying all of Defendant's *424 motions seeking to quash the grand jury indictment for alleged irregularities in the composition of the grand jury venire and proceedings before the grand jury. The trial court ruled that Defendant could not attack the indictment on the ground of the presentation of illegal evidence, nor could he invoke a preliminary trial to weigh the evidence presented to the grand jury. It also ordered that Defendant was not entitled to the transcript of the grand jury proceedings since he failed to show a particularized need for it. Finally, the trial court ruled that the Defendant failed to carry his burden of proof of racial discrimination citing Young, 569 So.2d 570. The trial court wrote: "As a white male, petitioner has failed to allege any prejudice suffered from the alleged under representation of blacks in the grand jury pool and as forepersons. Absent further allegations, mere statistical data is insufficient to warrant the severe remedy of quashing an indictment."
A month later, the trial court reconsidered its prior judgment and issued a supplemental opinion. Relying on this court's opinion in State v. Campbell, 94-1140 (La.App. 3 Cir. 3/1/95); 651 So.2d 412, it determined that a white defendant had standing to attack the indictment on the ground of racial discrimination against blacks in the makeup of the grand jury venire, selection of the grand jury foreman, and composition of the grand jury. After specifically finding that Defendant had standing, it nonetheless denied the motion and wrote:
Nevertheless, this Court still finds that petitioner failed to carry his burden of proof. Evidence submitted by petitioner during the hearing was insufficient to establish a prima facie case of discrimination. Petitioner failed to focus on the number of persons qualified for grand jury service living in Calcasieu Parish. See State v. Young, 569 So.2d 570 (La.App. 1 Cir.1990), writ denied, 575 So.2d 386 (La.1991). (emphasis added). Accordingly, this Court's prior denial of petitioner's motion is affirmed....
Defendant has had the opportunity to prove at least a prima facie case and he failed to do so. In Young, 569 So.2d 570, the court explained that a defendant challenging the racial composition of the grand jury or grand jury venire had to establish the percentage of minority members of the general venire or grand jury venire, or the percentage of minority members in the general population qualified to serve on the grand jury. Simply showing the percentage of minority members in the general parish population ignored "the fact that a substantial percentage of the general population does not meet the five qualifications which must be met in order to serve on a jury, or in this case as grand jury foreman." Id. at 576.[4]
Finally, in State v. Guillory, 97-179 (La. App. 3 Cir. 3/11/98), 715 So.2d 400, writ denied, 98-0955 (La.10/9/98); 726 So.2d 17, another first degree murder case involving the same attorneys and the same statistical information presented at the pretrial motion to quash, we rejected the defendant's claim of discrimination in selection of the grand jury foreman citing the failure to follow Young and establish a prima facie case. The Guillory case, which quoted extensively from Young, is factually similar to the case at hand and is clearly controlling.
Thus, we reject this assignment of error finding it has no merit.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant objected several times during the State's closing argument. He contends *425 that the State improperly referred to his failure to present evidence. Also, Defendant objected to the State's remark during closing argument about a "clever lawyer" trick.
Defendant first argues that the State improperly placed the burden of proof upon him when it referred to his failure to present evidence or witnesses. The objectionable argument occurred during the State's rebuttal to Defendant's closing argument, and was made in response to what Defendant had said in his closing argument. Thus, it was not an improper shift of the burden of proof.
The State argued in closing that Defendant's specific intent to kill both victims was evident from the extent and nature of the wounds, and from his statement to Landreneau, "You're dead, you're dead." Defendant's closing argument focused upon the manslaughter defense and his state of mind. He emphasized how the murders arose from a lover's quarrel between Melton and him after he learned she had sexual intercourse with another man. He also emphasized how it was he, and not the State, who introduced all of the statements he made after his arrest. After his closing argument, the State rebutted his claims by emphasizing that there was no evidence Defendant knew that Melton had previously engaged in sexual intercourse with another man.[5] Defendant objected, and later he objected to the State's argument that the alleged provocation to kill Melton did not apply to the murder of Landreneau.
Under La.Code Crim.P. art. 774, closing arguments should be restricted "to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice." Generally, before a verdict will be overturned on the basis of improper argument, the reviewing court must be convinced the jury was influenced by the remarks and the remarks contributed to the verdict. Guillory, 715 So.2d 400, citing State v. Moore, 432 So.2d 209 (La.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); State v. Messer, 408 So.2d 1354 (La. 1982).
The remarks Defendant complains about clearly fall within those arguments permitted by Article 774. The State was simply rebutting Defendant's arguments, and was not placing any burden of proof upon him. Therefore, this portion of the assignment of error is without merit.
Defendant also objected to the State describing a defense argument as the trick of a "clever lawyer." Defendant argued that he acted in the "heat of passion" during a lover's quarrel after he discovered Melton had sex recently with another man. He emphasized the results of the DNA analysis establishing that the semen found in Melton's vagina was from another man. The State countered in rebuttal that there was no way he could have known on September 1, 1993, that the semen of another man was contained inside Melton's vagina as this fact was established long after the murders when DNA testing eliminated Defendant as the source of the semen. The State argued that Defendant's theory of manslaughter was clever, stating: "It's not what happened in this case, which was a clever lawyer getting a lab report and seeing...." Defendant immediately objected to the remark and the trial court admonished the State to confine its argument to the facts of the case and not make comments about its opponent.
The admonition by the trial court sufficiently cured any possible prejudice to Defendant. Considering the evidence presented and the context of that single comment, the jury could not have been influenced by the remark and the remark did not contribute to the verdict. Therefore, this assignment of error is rejected.

ASSIGNMENT OF ERROR NUMBER FOUR
By this assignment of error, Defendant attacks the trial court's rulings granting the State's challenges for cause of twenty-one prospective jurors: Patrick O. Harrison; Dolores *426 East; Tracy Reliford; George Rose; Gail Hale; Audrey Murphey; Donald LeDay; Lawrence Pete, Jr.; Lorine A. Jackson; Mary Corbello; Truman Stacey; Tammy Lynn Marshall; Cynthia Faye LeBlanc; Wilson Richard; Raymond Poullard; Liz Friesner Glass; Ethel Ceaser Bellow; Debra A. Jones; Dennis Wayne Mayo; John D. Campbell; and Lona Leger.
The trial court excused for cause these prospective jurors because they testified that they were unable to impose the death penalty based upon personal, moral, or religious beliefs. La.Code Crim.P. art. 798(2) provides:
It is good cause for challenge on the part of the state, but not on the part of the defendant:
. . . .
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt[.]
We examined the transcript of the voir dire examination of the twenty-one prospective jurors Defendant mentioned, and eighteen clearly stated that they could not impose the death penalty. Three of the prospective jurors equivocated, at first, but eventually made it known they could not impose the death penalty. Glass could not say she would be able to impose the death penalty, but did say that her religious beliefs opposed the death penalty. Interestingly, Glass had an additional reason to be excused for cause. From 1988 to 1990 she had been a secretary in the District Attorney's Office and worked directly under Patricia Minaldi, the assistant district attorney in charge of prosecuting this case. In fact, Minaldi volunteered to step out of the courtroom while David Kimball conducted the State's voir dire examination of Glass. Glass also worked with Kimball, who assisted in the trial of the case, but she was not his secretary. The State's request to excuse Glass for cause was based on La.Code Crim.P. arts. 798(2) and 797(3), which encompass a relationship between the district attorney and the juror, and it is reasonable to conclude that such a relationship would influence the juror in arriving at a verdict. Even if the trial court should not have excused Glass on Article 798(2) grounds, the former employment relationship created such an appearance of impropriety that there was no error in excusing the juror.
Richard said he did not want to be a part of "it," it being the decision whether to sentence Defendant to death. Richard could not clearly state he would be able to impose the death penalty, and Defendant was unable to successfully rehabilitate him; thus, the trial court correctly granted the State's challenge for cause. Poullard was nervous and equivocating when the trial court, the State, and Defendant each tried to get him to state if he could impose the death penalty. Poullard testified that he could not say if he could do it. The trial court did not abuse its discretion in granting the challenges for cause.
However, we will further address this issue. La. Code Crim.P. art. 800(B) provides:
The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
An examination of the record reveals that Defendant exercised six of his twelve peremptory challenges in selecting the twelve-person jury and two more peremptory challenges while selecting the alternates; the State used seven of its twelve peremptory challenges in selecting the twelve-person jury and three more while selecting the alternates. In the recent Louisiana Supreme *427 Court decision of State v. Craig, 95-2499 (La.5/20/97); 699 So.2d 865, cert. denied, ___ U.S. ___, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997), the court dismissed the defendant's objection to the challenge of cause of a prospective juror and noted that Article 800(B) declares that the erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
In the present case, the State had unused peremptory challenges, and, consequently, even if Richard's and Poullard's dismissal for cause were erroneous, the State did not benefit by utilizing more than its allotted number of peremptory challenges. Thus, even assuming the trial court should not have dismissed them for cause, Defendant suffered no prejudice.
Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FIVE
In this assignment of error, Defendant claims his right to confrontation was limited. Although he refers to two passages of the trial transcript, neither actually support his claims. Furthermore, he did not object at trial to any rulings of the trial court that limited his right to confrontation. Other than the two cited portions of the trial transcript, he makes no further references to specific trial court rulings limiting his questioning. Also, he makes reference to a State's witness allegedly testifying that his blood alcohol level at the time of the crime was .34, but does not refer to the pertinent part of the trial transcript, and our review of the record reveals no such testimony at trial.
During Defendant's cross examination of Deputy Derrick Dion, the crime scene specialist who collected the evidence at the trailer, from Defendant's truck, and from the scene of arrest, Defendant attempted to show that the chain of custody of the red baseball cap he was wearing at the time of the crimes had not been properly established. The trial court never limited any of his questions and overruled one of the State's objections. Thus, there is nothing to support Defendant's claim that the trial court's rulings improperly limited his cross examination of Deputy Dion.
Again, during the cross examination of Detective Manny McNeal, the lead detective in the investigation, Defendant asked the detective who was responsible for the improper manner in which the seized evidence was packed for shipment to his experts. The State objected to Defendant's question because it assumed the fact that whoever packed the evidence did it improperly. The trial court requested that Defendant ask who sent the evidence; Detective McNeal did not know which of the three identification officers did it. Thereafter, Defendant asked about the manner of packing evidence for shipment, and Detective McNeal said that he had no training in that area and it was the function of the ID officers or the evidence custodian.
Defendant was not limited in his cross examination, nor did he object to being limited in any manner. Thus, this issue was not properly preserved for appellate review pursuant to La.Code Crim.P. art. 841. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER SIX
This assignment of error concerns an issue that never arose at trial. While the present case was pending, Defendant was considered a suspect in the murder of a Mrs. Pecorino committed before September 1, 1993, the date of the present crimes. Defendant filed four motions, seeking discovery of information about the Pecorino murder in anticipation of the State introducing this other crimes evidence at trial pursuant to La. Code Crim.P. art 404(B). Nothing else is known about the Pecorino murder. The trial court initially granted Defendant relief at a hearing on December 6, 1994, but on February 1, 1995, it issued a written ruling denying his motions because the State was not going to charge him with the Pecorino murder nor introduce any evidence concerning that murder at his trial. Defendant made a written objection in a pleading filed in February of 1995, but no other action was taken.
*428 Although Defendant complains he was denied discovery of the evidence from the investigation of the Pecorino murder, none of this evidence was introduced at trial, and the State made it clear one year before trial that nothing about the Pecorino murder was going to be introduced. Thus, the trial court did not err in denying Defendant discovery of this irrelevant information, and Defendant has failed to present anything more than conclusory allegations and citations of authority clearly distinguishable from this case. This assignment of error is, likewise, meritless.

ASSIGNMENT OF ERROR NUMBER SEVEN
In his final assignment of error, Defendant complains that the trial court erred in denying his motion for change of venue. Defendant filed a motion for change of venue before trial, but the trial court deferred ruling upon the motion until jury selection. During jury selection, he again urged the motion to change venue, but the trial court decided to wait until further voir dire had been completed. In the present case, Defendant was able to select a twelve-person jury and alternates exercising only eight out of his twelve peremptory challenges. At the conclusion of jury selection, the trial court denied the motion to change venue, and Defendant did not object for the record.
The grounds for a change in venue are set forth by La.Code Crim.P. art. 622 which provides in pertinent part:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
The burden of proof was on Defendant to prove that there existed such a prejudice in the collective minds of the people of the community that a fair and impartial trial was impossible. Bourque, 636 So.2d 254. A review of voir dire reveals that the press coverage of Defendant's case did not so prejudice the collective mind of the community to the point that he could not receive a fair and impartial trial.
Therefore, this assignment of error is also without merit and is rejected.

CONCLUSION
The convictions and sentences of defendant, Allison Scott Thibodeaux, are affirmed.
AFFIRMED.
NOTES
[1] Melton's blood type was "O."
[2] Landreneau's blood type was "A."
[3] This case held that the focus of a claim of discrimination in selection of grand jury forepersons is not the percentage of eligible blacks and females from the entire population of the parish, but instead the percentage of eligible blacks and females from the general venire and what percentage of this group was chosen to be grand jury forepersons.
[4] La.Code Crim.P. art. 401 provides in pertinent part:

A. In order to qualify to serve as a juror, a person must:
(1) Be a citizen of the United States and of this state who has resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service.
(2) Be at least eighteen years of age.
(3) Be able to read, write, and speak the English language and be possessed of sufficient knowledge of the English language.
(4) Not be under interdiction or incapable of serving as a juror because of a mental or physical infirmity, provided that no person shall be deemed incompetent solely because of the loss of hearing in any degree.
(5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned.
[5] Obviously, the State's claim arose from the State's forensic serologist's testimony that it was impossible for Defendant to know this fact by simply looking at Melton.