# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-1211

**STATE OF LOUISIANA**

**VERSUS**

**JOSEPH ERIC VERCHER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR2013-2714
HONORABLE JOEL GERARD DAVIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Shannon J. Gremillion, and David Kent Savoie, Judges.

**CONVICTIONS AND SENTENCES AFFIRMED.**

**Paula Corley Marx**
**Louisiana Appellate Project**
**P. O. Box 80006**
**Lafayette, LA 70598-0006**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    Joseph Eric Vercher

**Herbert Todd Nesom**
**District Attorney, Thirty-Third Judicial District Court**
**Joe Green, Assistant District Attorney**
**P. O. Box 839**
**Oberlin, LA 70655**
**(337) 639-2641**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**GREMILLION, Judge.**

In the early morning of June 29, 2013, Defendant, Joseph Eric Vercher, arrived at the Allen Parish Sheriff's Office and spoke with Frederick Stewart, an officer with Oberlin Police Department. Defendant advised the officer that he had stabbed his wife, Rachael Vercher, to death. Following a jury trial, Defendant was found guilty of second degree murder, a violation of La.R.S. 14:30.1, and obstruction of justice, a violation of La.R.S. 14:130.1. He was sentenced to life imprisonment for the offense of second degree murder, without the benefit of parole, probation, or suspension of sentence, and ten years at hard labor on the offense of obstruction of justice, to be served concurrently with the life sentence.

Defendant now appeals and asserts that the evidence was insufficient to sustain the verdict of second degree murder. He contends that he should have been found guilty of manslaughter. He also asserts that the evidence was insufficient to sustain the verdict of obstruction of justice. Finally, Defendant argues that the trial court erred when it permitted prejudicial, post-mortem photographs of the victim to be shown to the jury. For the following reasons, we affirm Defendant's convictions and sentences.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO

Defendant argues that the evidence was insufficient to establish second degree murder in the stabbing death of his wife. Defendant asserts that he was provoked into stabbing her. He contends that during their marriage of two years, she was physically abusive and that on the evening of the killing, after driving around on back roads in Allen Parish, drinking and smoking crack cocaine, she wanted him to drop her off at another man's house. He asserts that the facts

establish a classic case of manslaughter because he acted in sudden passion or heat of blood when he stabbed her to death.

Defendant further argues that the evidence was insufficient to establish the offense of obstruction of justice, in that he reported the killing within a few hours of the incident, was cooperative with the police by taking them to the body, and pointed out the location of the knives he threw away after he dragged her body into a field.

Second degree murder is defined as the killing of another "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1. Manslaughter is defined as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La.R.S. 14:31(A)(1).

Obstruction of justice is defined, in pertinent part, as:

> A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
>
> (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>
>> (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers[.]

La.R.S. 14:130.1.

While Defendant did not testify at trial, the State presented to the jury two audio tapes of statements Defendant made to the police. The interviews were conducted on June 29, 2013, by Detective Peggy Kennedy, Chief Detective and supervisor with the Allen Parish Sheriff's Office, and on June 30, 2013, by Fredrick Stewart, an officer with the Oberlin Police Department. Defendant's version of the events leading up to and of the killing is summarized below:

Defendant said that he had met the victim in August 2011, and they married on April 28, 2012.

The killing took place late in the evening of June 28, 2013. The current argument involved an incident that occurred the previous Monday, when the couple went to the Coushatta Casino. Later in the evening, Defendant wanted to go home, and the victim wanted to stay. After they began to argue, casino security became involved. The victim was arrested because she was found to be in illegal possession of pain pills and taken to jail. Defendant went to the victim's mother's house, where the couple was staying. The next morning, he bonded his wife out of jail, but her mother became angry and kicked him out of the house because he had turned the victim into the police. Defendant was, from that day until the night of the killing, living in his truck under a bridge.

A few days before the killing, the couple was together in Defendant's truck when the victim took a knife and cut herself on the arm and the leg. She held the knife up to Defendant's chin and threatened that she would kill him if he hurt her. Defendant said that the victim would cut herself in order to get pain pills.

On Friday afternoon, they took the victim's son, who played on the Oakdale all-star baseball team, to a baseball tournament. After the game, they took the boy to a cousin's house for the night. They got a twelve-pack of beer at Carol's Grocery, a convenience store, then went to the victim's mother's house and washed clothes. Defendant and the victim got a second twelve pack of beer at Valero's gas station and then rode around drinking beer and whiskey. He stated they had both done cocaine earlier in the day. They went to the casino, but the victim did not want to go in. They continued riding around. She began to yell at him for turning her into the police and getting her arrested for possession of the pain pills. Defendant wanted to go to a motel for the night, but the victim insisted that she wanted to go to "Mr. Ron's" house, an old man who would buy her whatever she wanted, including crack cocaine. They continued to drive around back roads.

At one point, Defendant pulled the truck over in a driveway to a deer lease. He had two knives in the truck, a Buck knife in the console and a smaller knife in the driver's side door panel. He got out of the truck, grabbed the knife out of the door panel, and walked around to the victim's side of the truck. Defendant could not explain why he grabbed the knife as he exited the truck. When he opened the door, the victim tried to hit him but fell out of the truck onto the ground. Defendant said that the victim accused him of cheating on her, and he was sick and tired of it. He said he snapped. Defendant stabbed her in the chest as she lay on the ground. He then took the Buck knife out of the console and cut her throat. He did not recall how many times he stabbed and cut her. She attempted unsuccessfully to get up but did not attempt to fight him off. Defendant dragged the victim away from the road about fifteen or twenty feet to where her body could

4

not be seen. He threw the knives away. He took off her wedding ring and put it into his pocket. He said he did not want anyone to see her like that. He took the ring because he did not want anyone to steal it.

As Defendant drove away, he threw the victim's phone and purse out of the driver's side window, but he kept her wallet. He drove back to the convenience store and withdrew money from an ATM. He drove to Karrie Bradley's house, where he told Mr. Bradley what he had done to the victim. Defendant drove to someone else's house to whom he owed money. Finally, he drove to the Allen Parish Sheriff's Office.

Several police officers who had come in contact with Defendant that night testified at trial. Officer Stewart, who was the first officer Defendant talked to at approximately 1:28 a.m., on June 29, 2014, testified that Defendant was calm but appeared to be tired and sluggish. He knew Defendant from a time when he was summoned to the couple's residence to intercede in a domestic dispute. During that incident, he witnessed the victim hitting Defendant. Otherwise, he testified, he did not know of any problems with Defendant. Officer Stewart stated that while the victim was diminutive, Defendant was a tall, large man.

Jimmy Holmes, a deputy with the Allen Parish Sheriff's Office, arrested Defendant after he was shown the victim's body at the crime scene. Deputy Holmes took pictures of the crime scene. He testified that Defendant told him the victim wanted to go to that "old bastard's house."

Voorhies Leger, a detective with the Allen Parish Sheriff's Office, testified that the victim's body could not have been seen from the road. Detective Leger located the two knives approximately seven to fifteen feet away from the body. He interviewed Mr. Bradley, who has since died, and "Mr. Ron," who has also died.

5

He further testified that the next day, a family member located the victim's purse on the side the road. The victim's cell phone was located approximately one-eighth to one-quarter of a mile away. The cell phone had been broken in half. Detective Leger also testified that Defendant did not have a criminal history. The detective obtained the surveillance videos from Carol's Grocery showing Defendant and the victim purchasing beer at 7:33 p.m. and, later from Valero's gas station, showing the victim getting money from the ATM and Defendant purchasing a second twelve-pack of beer at 9:21 p.m. The surveillance video from Valero's then showed Defendant, by himself, getting money from the ATM at 12:29 a.m.

Jill Seahimer, a patrol officer with the Coushatta Casino police, testified regarding the incident at the casino the Monday prior to the killing. She stated that the couple began arguing because he wanted to go home and the victim wanted to stay at the casino. The victim told the officer that she was afraid to go home because Defendant might hurt her. She told the victim to call someone to come and pick her up. However, the victim's cell phone was in her purse in Defendant's truck. Officer Seahimer escorted Defendant outside to get the victim's purse. At that time, Defendant reached into the purse and handed the officer a bottle which contained pain pills. He advised the officer that the pills did not belong to the victim.

Doctor Terry Welke, a forensic pathologist, testified that he performed the autopsy on the victim's body. He testified that the victim was five-foot-three inches tall and weighted one hundred twenty pounds. He described two knife cuts in her throat. The windpipe and the left carotid artery were cut, both potentially life threatening wounds. She was also stabbed in the chest several times, piercing

6

one lung and the heart. She was stabbed in the back, which pierced the other lung. These wounds were also life threatening. She had heavy bruising around the skull and face area. He theorized that some of the bruising could have been more than a day old. Dr. Welke opined that she could have lived from two to ten minutes following the stab and cut wounds. She had several bruises and cuts around her body, including a significant cut across the back of her neck. A toxicology report was submitted, which showed that the victim had 0.239 blood/alcohol content, plus there was evidence of cocaine in her system.

Tracey Dodd Perkins, a longtime friend of the victim's, testified that her son and the victim's son were on the same baseball team. A day or two before the victim was killed, she and the victim were at a ball game together. Perkins stated that Defendant was in the parking lot, repeatedly calling and texting the victim. Perkins and the victim went out to the parking lot together. Perkins said that the victim had flushed her wedding ring down the toilet the day before. However, Defendant had the ring and gave it back to the victim. Later that evening, she saw the victim and Defendant together in his truck. The victim waved at her. Perkins stated that she had seen bruising on the victim in the past and had offered the victim and her son a place to stay should she decide to leave Defendant.

Leslie Cole, also a baseball mom, was at the Friday game. She walked out to the parking lot with the victim to fetch her son's batting bag from Defendant's truck. Cole reported that Defendant told the victim that they needed to talk or that would be the last time she would ever see him alive. Cole also reported seeing bruises on the victim.

Tori Bell testified that she had been a friend of the victim's and, at one time, a neighbor of the victim and Defendant. She stated the couple often argued.

About a week prior to the killing, Defendant and the victim were at Bell's place for a BBQ. Bell said they acted "all in love." However, a week after, Defendant showed up at her house and told her that he and the victim had split up, but that he was not going to give up on his wife.

Renee Lambert, the victim's mother, testified that during their two-year marriage, Defendant and the victim had lived with her on and off. Lambert explained that "Mr. Ron's" daughter, who was the victim's age, had suffered a stroke and lived with her father. Lambert said that "Mr. Ron" was in his eighties. The victim would go over to his house to visit with the daughter and sometimes would help out around the house. The victim and Defendant were living with Ms. Lambert at time of the incident at the casino. This time, when Lambert told Defendant to leave the house, the victim wanted him to stay away.

Defendant's daughter, son, mother, and former wife all testified that Defendant never exhibited abusive behavior towards them. Defendant's son, Kelton Vercher, however, had witnessed the victim hitting Defendant. This was the episode that Detective Steward witnessed. Defendant's daughter, Alexis Vercher Smith, testified that after Defendant got together with the victim, she and her brother's relationship with their father became strained. She testified that her father was never a drinker until he met the victim, and that every time she saw the victim, the victim was drunk. The former wife, Lisa Marie Vercher, testified that even when she began an affair with another man, Defendant never became violent but wanted to see a marriage counselor to save the marriage. She stated that even after she continued to live in the same household after he learned of her infidelity, he was never mean or violent towards her. Finally, Rose Vercher, Defendant's

mother, testified that she never witnessed Defendant and the victim arguing. However, she did see the victim cutting herself one day.

***Second Degree Murder/Manslaughter***

Defendant argues that, coupled with the victim's abusive history, her behavior the night of the killing was sufficient to mitigate second degree murder to manslaughter.

This court discussed the claim of insufficient evidence in *State v. Kennerson,* 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

Initially, we note that, in the current case, the fact of Defendant's acts of first stabbing the victim in the chest, then switching knives and cutting her throat, indicates that, at the very least, he specifically intended to inflict serious bodily harm. *State v. Johnson,* 06-623 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, *writ denied*, 06-3024 (La. 9/14/07) 963 So.2d 995. Accordingly, when the acts, such as stabbing someone in the chest and cutting their throat, are committed in "sudden passion" or "heat of blood," it is the accused's burden to prove by a preponderance

9

of the evidence that he was sufficiently provoked to commit the acts. *State v. Lombard*, 486 So.2d 106 (La.1986).

Defendant did not demonstrate that he was provoked into such an attack on the victim. While they were arguing and did have a tremulous relationship, arguments do not suffice to reduce a murder to manslaughter. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, *writ denied*, 98-3119 (La. 5/14/99), 741 So.2d 659. "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather they are factors which serve to mitigate murder to manslaughter. *Lombard*, 486 So.2d 106. According to Defendant, the same arguments, the casino incident, and the victim visiting "Mr. Ron," had been ongoing. There were no surprises. Furthermore, Defendant's attempt to cover up the crime by hiding her body; throwing away the knives, her cell phone, and her purse; withdrawing money from an ATM to pay back a debt; and visiting a friend, all prior to going to the police, indicates that whatever provocation he may have been under was not great. Defendant purposefully grabbed the knife out of the driver's side door panel and walked around the truck. When he pulled open the door and she fell out because she was so drunk, if anything, should have provoked hilarity or at the least pity. However, Defendant leaned down, stabbed her a few times, then took the time to switch knives and continued to inflict fatal wounds.

Viewing the evidence in a light most favorable to the State, there is sufficient evidence to find specific intent to kill or inflict serious bodily injury. However, Defendant failed to demonstrate by a preponderance of the evidence that he was provoked into losing his self-control and stabbing the victim and killing her.

*Obstruction Of Justice*

While Defendant admitted he dragged the victim's body to a location where it could not be seen from the roadway, threw the weapons used to kill the victim farther into the field, and tossed her personal items out of the truck window as he drove away from the scene, he argues that, because a few hours later he reported the incident to the police, he was not guilty of obstruction of justice. Defendant argues that there was no knowledge of the crime until he went to the police, and that his willingness to cooperate indicates that he lacked specific intent to hide or destroy evidence.

As discussed above, the victim was seen alive with Defendant at 9:21 p.m. Defendant was then seen alone at 12:29 a.m. The victim was killed within that three-hour period. Defendant did not show up to the police station until approximately 1:28 a.m.

As also noted above, obstruction of justice is a specific-intent crime. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Therefore, specific intent need not be proven by fact but can be inferred from the circumstances and the actions of the defendant. *State v. Allen*, 99-320 (La.App. 5 Cir. 7/27/99), 742 So.2d 949.

Defendant's actions indicate that he had the intent to hide his crime since he dragged the body out of sight and threw away the weapons and her personal items. Particularly notable is the fact that he kept her wallet, which would have contained her identification. That he changed his mind after he attempted to cover up his actions does not change the fact that he acted to cover up his actions.

11

There is no merit to these two assignments of error. Viewed in a light most favorable to the State, the evidence was sufficient for the jury to find Defendant guilty of second degree murder and obstruction of justice beyond a reasonable doubt.

## SUPPLEMENTAL ASSIGNMENT OF ERROR NUMBER THREE

Defendant argues that the trial court erred when it permitted the State to publish autopsy photographs of the victim's injuries. Defendant filed a motion *in limine* to suppress the photographs. At the hearing, Defendant argued that, since he was asking for a manslaughter conviction, the inflammatory nature of the gruesome photographs would outweigh their probative value; therefore, the photographs were unduly prejudicial and should have been suppressed.

Photographs are not admissible if they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. *State v. Craig,* 95-2499 (La. 5/20/97), 699 So.2d 865, *cert. denied*, 522 U.S. 935, 118 S.Ct. 343 (1997). "The mere fact that the crime scene photographs are unpleasant, horrifying, or gruesome does not render them inadmissible, nor does the fact that the photographs bring vividly to the jurors the details of a shocking crime. The key is that the probative value of the photographs outweighs their prejudicial effect." *State v. Thibodeaux*, 97-1636, pp. 9-10 (La.App. 3 Cir. 11/18/98), 728 So.2d 416, 422, *writ denied*, 98-3131 (La. 5/7/99), 741 So.2d 27, *cert. denied,* 528 U.S. 936, 120 S.Ct. 341 (1999). A trial court's ruling in this regard will only be disturbed if the prejudicial effect of the photographs clearly outweighs their probative value. *State v. Ruffins*, 32,870 (La.App. 2 Cir.12/10/99), 748 So.2d 614.

In *State v. Gilbert,* 10-31, pp. 10-12 (La.App. 3 Cir. 6/2/10), 41 So.3d 566, 573-74, *writ denied,* 10-1550 (La. 1/14/11) 52 So.3d 901, this court considered what the defendant asserted were prejudicial, gruesome photographs of a murder victim, as follows:

> Defendant asserts the photographs, State's Exhibit 7, were prejudicial and not necessary, as the defense was willing to stipulate to the cause of death. Further, Defendant maintains the photographs were not needed to prove corpus delecti or to identify the victim, and the probative value of the photographs did not outweigh their prejudicial effect. We disagree.

> > The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence.

> *State v. Broaden*, 99-2124, pp. 22-23 (La.2/21/01), 780 So.2d 349, 364, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) (citations omitted).

> > The mere fact that the crime scene photographs are unpleasant, horrifying, or gruesome does not render them inadmissible, nor does the fact that the photographs bring vividly to the jurors the details of a shocking crime. The key is that the probative value of the photographs outweighs their prejudicial effect.

> *State v. Thibodeaux,* 97-1636, pp. 9-10 (La.App. 3 Cir. 11/18/98), 728 So.2d 416, 422, *writ denied*, 98-3131 (La.5/7/99), 741 So.2d 27, *cert. denied,* 528 U.S. 936, 120 S.Ct. 341, 145 L.Ed.2d 266 (1999). Thus, "[a]n offered stipulation bears upon this balancing test, but the decision is primarily one for the trial court. The state cannot be robbed of the moral force of its case merely because the stipulation is offered." *State v. Watson*, 449 So.2d 1321, 1326 (La.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985) citations omitted). *See also State v. Perry*, 502 So.2d 543 (La.1986), *cert. denied*, 84 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); *State v. Ball*, 99-428 (La.11/30/99), 756 So.2d 275.

For example, the supreme court held that the trial court did not err when it admitted photographs depicting the nude body of the victim lying on her back on an autopsy table. *State v. Lindsey*, 404 So.2d 466 (La.1981). Also, the photographs depicted the victim's head and upper torso with a trickle of dried blood streaked on her face, and the victim from head to knee revealing a sutured incision made in her torso as part of the autopsy. There, in an attempt to prevent the admission of these photographs into evidence, the defendant recounted his earlier admission to the correctness of the autopsy report establishing the cause of death and identity of the victim. Nevertheless, the supreme court wrote that these photographs "identify the victim, corroborate the fact of death, and press home the fact that the case deals with a concrete event, the killing of a flesh and blood human being." *Id*. at 475-76. The court noted that while these photographs were not pleasant, they were not particularly gruesome because "[n]either photo depicts more blood than might result from a minor cut or nosebleed. The pictures were taken in a 'sterile' environment, detached from the immediacy of the scene where the fatal injury was inflicted." *Id.* at 476. Thus, the probative value of the photographs outweighed their possible inflammatory effect.

Here, State's Exhibit 7 consists of two photographs. One photograph depicts the victim lying on his back with two wounds to the upper chest area. In the second photograph, the victim is face down and three wounds to the back are depicted. Each photograph was taken from the waist up, and a minimal amount of blood is visible.

Like the supreme court in *Lindsey*, 404 So.2d 466, we do not find these photographs to be so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence. Despite Defendant's offer to stipulate to the cause of death, the photographs were used to show the jury the injuries suffered by the victim. Thus, the probative value of the photographs is not substantially outweighed by any prejudicial effect they may have had on the jury. Therefore, the trial court did not abuse its discretion by admitting the photographs into evidence.

During Doctor Welke's testimony, the State offered into evidence State's Exhibit 21, *en globo*, twenty-four photographs showing full frontal and back views of the victim's naked body. Three of the photographs showed the deep cuts in the victim's neck. One of the photographs showed a much-bloodied face. One of the photographs showed a flap of scalp pulled back to reveal a wound to the skull. The rest of the photographs showed multiple cut and stab wounds and what Doctor

14

Welke theorized were older bruises on the face, back, and legs. At the hearing, the State argued that the photographs were necessary to show the brutality of the murder in order to refute Defendant's assertion that he committed the killing in sudden passion or heat of blood. The deliberateness of the cuts to the victim's neck and the stab wounds to the victim's chest area were evidence of his specific intent to kill her.

While the pictures are gruesome, we find that the probative value of the pictures outweighed the prejudicial effect. Accordingly, there is no merit to this assignment of error.

## DECREE

Defendant's convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED**.